No. 32,364

THE ERIE STATE BANK, an Insolvent Corporation, by Charles W. Johnson, Receiver, *Appellee,* v. W. E. CRAIG, *Appellant.*

(46 P. 2d 608)

Opinion filed July 6, 1935.

*Clark M. Fleming,* of Erie, for the appellant.

*Hugo T. Wedell,* of Chanute, and *George W. Donaldson,* of Erie, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by the receiver of the failed Erie State Bank, to recover assets of the Allen State Bank in possession of defendant Craig as liquidating agent of the Allen State Bank. A demurrer to the petition was overruled, and Craig appeals.

In October, 1931, there were two state banks in Erie, in Allen county, the Allen State Bank and the Bank of Erie. Perhaps neither bank was in first-class condition, one bank was sufficient to serve the locality, and the two banks agreed to consolidate. To accomplish consolidation, a new bank, the Erie State Bank, was organized to succeed the others. The consolidation took place, pursuant to the following statute:

"Any bank or trust company authorized to do business in the state of Kansas is hereby authorized and empowered to consolidate with any other bank or trust company authorized to do business in the state: *Provided,* That both such banks or trust companies so consolidating shall have their banking houses in the same county in the state of Kansas. Such consolidation shall be upon such terms as may lawfully be agreed upon by the two banks or trust companies and with the consent of the bank commissioner.

"In case of such consolidation, the consolidated bank and/or trust company shall become, without deed or transfer of any kind, the owner of and entitled to all rights, franchises and interests, which shall be referred to in such agreement, of every bank and/or trust company which shall be subject to the laws of the state of Kansas, and which shall so consolidate, including every species of property and everything of value of every kind and description except real estate; and such consolidated corporation shall, without further appointment, act as trustee, executor, administrator or in any other fiduciary capacity in which any such bank or trust company subject to the laws of this state was acting at the time of such consolidation." (R. S. 1933 Supp. 9-101d and 9-101e.)

As indicated, the terms of consolidation were settled by agreement. While the petition does not so allege, it will be assumed the bank commissioner consented.

The first step in the consolidation consisted of an agreement between the Bank of Erie and the Allen State Bank. The agreement provided for organization of the new bank. The stockholders of the contracting banks were to become stockholders of the new bank on the basis of one share of new stock for two shares of existing stock, and the directors of the new bank were to be chosen from the boards of directors of the contracting banks. The new bank was to take over selected assets of the contracting banks. The con-

tracting banks were to go out of business for the purpose of transacting banking business, but were to retain their charters for the purpose of handling assets not taken over by the new bank. Stockholders of the contracting banks approved the consolidation; a charter for the new bank was procured; shares were issued; and a board of directors was chosen in accordance with the contract. W. E. Craig became a director and cashier of the new bank.

The litigation grows out of consolidation of the Allen State Bank with the new bank, the Bank of Erie is not concerned, and for convenience, the Allen State Bank will be referred to as the old bank, and the Erie State Bank will be referred to as the new bank.

Consolidation of the old bank and the new bank was effected pursuant to separate agreement between them, in the following manner: The old bank made a detailed statement of its resources and liabilities as of December 19, 1931, which was the basis of the consolidation. The new bank assumed and agreed to discharge liability of the old bank to its creditors, as per list showing general deposits and certificates of deposit. No other obligations were assumed, and it was expressly agreed liability to stockholders of the old bank was not assumed. The new bank took over itemized assets of the old bank, including certain bills receivable, or loans and discounts. The new bank did not take over certain other itemized assets, designated as rejected assets. Rejected assets were to remain in the hands of the liquidating agent of the old bank. The consolidation agreement provided that rejected assets were pledged as collateral security toward collectibility of accepted assets, for the period of eighteen months from date of the agreement, December 19, 1931. During the same period the new bank had a right to substitute accepted assets for like amounts of rejected assets.

On June 3, 1933, sixteen days before the eighteen-month period of pledge expired, the new bank failed. W. E. Craig was the liquidating agent of the old bank. On May 11, 1934, the receiver made demand on Craig for assets rejected at the time of consolidation, and held as collateral security, and for any proceeds of such assets derived from collection or sale.

The petition pleaded the foregoing facts. One theory of the petition was, all assets of the old bank became property of the new bank, because the old bank was extinguished by consolidation. The theory is quite incompatible with the terms of the consolidation agreement. The agreement was authorized by the statute, and was approved by

the bank commissioner. Although the old bank went out of existence for purpose of doing a banking business, it still had affairs to be wound up, and retained its charter for that purpose. Logical deduction from philosophical conception of consolidation could not operate to compel the new bank to be owner of assets which it did not take over, and which it is likely the bank commissioner would not permit the new bank to take over.

The new bank might make two claims upon rejected assets of the old bank. If the maker of a rejected note to the old bank should strike oil, or come into an inheritance, or win a prize in a lottery, the new bank could call for that note by substituting an equal amount of accepted assets of the old bank. This privilege is not here involved.

The new bank could exercise its privilege as pledgee for purpose of collateral security. Exercise of that privilege was expressly limited to a definite period. The privilege was not exercised by anybody within that period, and it expired on June 19, 1933.

The petition was framed on another theory, based on the following facts:

When the consolidation took place, the directors of the old bank knew the nature and quality of accepted assets, knew the general financial depression was on, and knew that rejected assets would likely be needed to make good accepted assets. Therefore, the security pledge was made. It turned out, accepted assets were not worth face value, were not collectible before June 3, 1933, when the new bank failed, and the rejected assets are necessary to guarantee payment of accepted assets. The new bank was in failing condition from the beginning of January, 1933, until the time the receiver was appointed in July, 1933. Craig and the members of the board of directors of the new bank, who had been directors of the old bank, knew the kind and quality of the accepted assets, and the condition of the new bank before expiration of the eighteen-month security period, but they did not do anything to obtain possession of the pledged rejected assets. The conclusion deduced in the receiver's brief from these allegations is, that because the directors of the new bank failed to demand of Craig the rejected assets, to make good accepted assets which had gone bad, they were guilty of fraud and breach of trust, which precludes Craig from keeping the security.

The sole delinquency of the directors of the new bank was that

they did not reduce the security to possession within the security period.

In December, 1931, the officers and directors of the new bank did not regard the rejected assets as fit to become assets of the new bank. What the rejected assets were worth then is not disclosed. There is nothing to show that they improved in value as the financial depression deepened, and what they were worth from January to June, 1933, is not alleged and cannot be surmised. It might have been a waste of money to put any item in judgment, and if put up for sale, perhaps the entire lot would not have brought enough money to pay expense of sale. Whether the directors should call for the security was not a matter of law, but was a matter of judgment in bank management. They were not required to do a vain thing, and the petition does not disclose either that they used bad judgment, or that the new bank, in fact, lost anything.

There is no allegation in the petition of improper motive, intentional misconduct, or any kind of bad faith on the part of the directors of the new bank. There is nothing in the petition to arouse the faintest suspicion the directors acted for the benefit of the stockholders of the old bank in not calling for the rejected assets before the new bank failed. The time to call for the security had not elapsed when the new bank failed, and management of its affairs vested in the receiver. The receiver did not make up his mind to call for the security until nearly a year had elapsed after the bank failed.

The result of the foregoing is, the conclusion stated in the receiver's brief, that the directors of the new bank were guilty of fraud and breach of trust, is not warranted by the facts pleaded in the petition, either as a conclusion of fact or as a conclusion of law.

The judgment of the district court is reversed, and the cause is remanded with direction to sustain the demurrer to the petition.